# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **Allison Ray,** | Case No. 24-cv-882 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **Bell Partners, Inc. and Joseph F. Cannon,** | |
| Defendants. | JURY TRIAL DEMANDED |

## INTRODUCTION

1.      Until early this year, Allison Ray was a Senior Vice President at Bell Partners, Inc. ("Bell"). Ray was a top performer at Bell; she worked hard and was rewarded for her performace with stellar reviews and promotions over the course of her 17 years with Bell. That is until she was assigned to report directly to Bell's Chief Investment Management Officer Joesph Cannon.

2.      Cannon has a history at Bell of discriminatory and demeaning treatmeant of senior-level, accomplished women like Ray. Bell's top executives were well-aware of his history and not only failed to take any action to deter or correct his unlawful conduct but placed Ray directly in his line of fire.

3.      After 18 months of being bullied, manipulated, and demeaned by Cannon, Ray developed debilitating anxiety, hair loss, insomnia, among other things, and had to seek care from a physician. Despite having spent her entire career in demanding and

high-pressure roles, Ray had never experienced anything like this. Ray's medical condition arose exclusively because of Cannon's hostile and discriminatory treatment.

4. Even as her health was deteriorating under Cannon's leadership, Ray still maintained her exceptional performance at Bell and, in those 18 months, completed three corporate goals relating to property budgets and construction metrics with top marks of 95%, 90%, and a rare 100%. Rather than give her the praise she deserved for her success (by objective metrics, no less), Cannon put Ray on a Performance Improvement Plan ("PIP") in February of 2024. Cannon—who constantly disparaged women like Ray over the age of 40 in senior leadership—gave Ray mere weeks to get things "fixed".

5. Bell knew about Cannon's treatment of Ray because she reported her concerns to multiple Bell executives. Yet, Bell did nothing to address Cannon's discriminatory treatment. Bell allowed Cannon's ageist and sexist behavior to go unchecked for months on end, culminating in Cannon confecting "performance issues" about Ray and placing her on a PIP designed to force her, a professional woman over the age of 40, out of Bell.

6. And, in a way, it worked. Ray was forced to resign on April 8, 2024 because of Cannon's unlawful treatment.

## **PARTIES**

7. Plaintiff Allison Ray is a citizen of Guilford County, North Carolina.

8. Defendant Bell Partners, Inc., a multifamily asset management firm, is incorporated under the laws of North Carolina with its principal place of business in

2

North Carolina. Bell engages in substantial business across the United States.

9.      Defendant Joseph F. Cannon is a citizen and resident of Wake County, North Carolina. He is Bell's Chief Investment Management Officer and was Ray's direct supervisor during the period at issue in this lawsuit.

## JURISDICTION AND VENUE

10.      Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. §§ 1331, 1343(a), with federal questions involving Title VII and the AEDA.

11.      This Court has personal jurisdiction over Defendants Bell and Cannon.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Middle District of North Carolina.

## CONDITIONS PRECEDENT

13.      By statute, a civil action under Title VII and/or the AEDA must be filed within 90 days of the date of receipt by a claimant of a duly issued Notice of Right to Sue from the EEOC.

14.      Ray filed her charge of discrimination with the EEOC on July 5, 2024.

15.      Ray received a Dismissal and Notice of Rights from the EEOC dated August 14, 2024.

16.      All conditions precedent to the institution of this lawsuit have been fulfilled by Ray.

17.      This Complaint is filed on or before the 90-day period after Ray received

3

the Dismissal and Notice of Rights letter.

**FACTUAL ALLEGATIONS**

**Ray Was One of the Longest Tenured and Most Successful Members of Bell's Senior Management.**

18.     Bell is a nationwide real estate investment and management company headquartered in Greensboro, North Carolina and focuses on multifamily rental communities throughout the United States.

19.     In 2007, Ray joined Bell as a Senior Corporate Accountant.

20.     Ray proved her promise quickly and was promoted to Vice President of Financial Analysis and Strategic Initiatives within 18 months of beginning her career at Bell (all the while juggling the responsibilities of her position at a rapidly growing real estate company with being a mom to preschool-aged children).

21.     By 2010, Ray had begun reporting directly to Bell's Chief Financial Officer, John Tomlinson.

22.     Over the next nearly 15 years, Ray managed a number of sub-groups within Bell's Financial Services group.

23.     Ray approached her leadership responsibilities with a unique combination of empathy and ingenuity that allowed each sub-group that she ran to flourish.

24.     Ray's track record of success led to her promotion to the senior vice president level in 2017, when she became Bell's Senior Vice President of Investor Accounting and Finance.

25.     In this elevated position, Ray directed Bell's Fund Accounting, High Net Worth Investor Relations, and Compliance subgroups.

4

26. Ray's role was reconfigured in 2018 and she became the Senior Vice President of Financial Services, expanding her leadership of subgroups to also include Financial Planning & Analyis, Property Accounting, and Construction Accounting,

27. During her tenure with Bell, Ray led the company to numerous operational milestones. Among these, Ray:

      a. Created the Fund Accounting subgroup in 2008;

      b. Produced Bell's first fund-level audited GAAP financial statements, in cost and fair value formats, for private real estate funds;

      c. Created Bell's historical performance database in order to establish an auditable trail of data dating to the 1970s, which enabled her to generate current and projected internal rates of return and cash returns on equity that helped to successfully attract billions in capital commitments from domestic and foreign institutional investors;

      d. Oversaw annual audits for more than 25 entities and tax returns for more than 250 entities year after year with no significant deficiencies or material weaknesses;

      e. Developed and launched Bell's external investor portal that was nationally recognized as a Realcomm Digie award finalist for best use of automation;

      f. Established investor reporting standards and formats for Bell's high net worth and institutional investors; and

      g. Led several enterprise-level platform implementations

5

including:

- Complete overhaul of the internal investment management module ("Chicago Project");

- Development of a comprehensive budget system and metric dashboards for internal and external audiences; and

- Integration of Blackline software to automate reconciliation of approximately 800 bank accounts on a monthly basis.

28. Her leadership function within Bell was equally as expansive, as Ray:

a. Led a team of more than 40 accounting associates responsible for the financial analysis and reporting of several private equity real estate funds, more than 200 separate account entities, and approximately 300 multifamily assets;

b. Managed the Investor Relations group that served more than 700 individual high net worth and institutional investors;

c. Chaired Bell's leadership committee in 2009, which consisted of professionals with rapid advancement potential; and

d. Served on the 401k, Governance, and IT Steering Committees for several years at Bell.

29. The groups and subgroups led by Ray consistently exceeded both internal and external metrics for performance, staff engagement, and employee satisfaction.

30. More importantly, Ray's colleagues at Bell held her in high regard and she was frequently chosen by peers or leadership to facilitate workplace discussions, chair

6

subcommittees, mentor associates, and lead internal training sessions.

31.     Lastly, Ray's annual performance reviews documented her exemplary record—she earned "meets expectations" or "exceeds expectations" scores across the board, year after year.

### Cannon's Biased and Harmful Behavior was Allowed to Persist Amongst a Toxic Culture at Bell.

32.     Cannon is a member of the C-Suite at Bell, a member of Bell's Executive Committee, a part owner of the company, and a favored executive by Bell's Chief Executive Officer Lili Dunn.

33.     Cannon is also a destructive manager, has a bias toward women at Bell, particularly women over the age of 40, and is shielded from consequences by Dunn.

34.     Cannon's harmful behavior as a leader is evidenced by his track record with direct reports.

35.     Upon information and belief, no employee or executive at Bell who ever reported directly to Cannon survived more than two years of doing so and were either transferred to other positions and supervisors within Bell or left their jobs at Bell altogether.

36.     For example, Bell's previous Manager of Portfolio Management, a woman, had to take medical leave for health reasons after reporting to Cannon for approximately two years.

37.     Cannon ridiculed this woman for taking medical leave, commenting to Ray that she "had a f**king mental breakdown".

38.     After returning from medical leave, this woman was soon reassigned to a

7

different direct supervisor.

39.     Similarly, a former SVP of Portfolio Management at Bell, also a woman, left Bell after directly reporting to Cannon for only about six months.

40.     Cannon's disdain for professional women over the age of 40, women like Ray, is apparent from the offensive comments that Cannon made to Ray about other older women in senior management at Bell.

41.     In the Fall of 2023, Cannon told Ray that Bell's Chief Operating Officer Cindy Clare was a "joke" and a "disaster" and that the company needed to get rid of her but that it was "not a good time to trade out  horses".

42.     Such comments were typical of Cannon's biased opinion of Clare who is a woman over the age of 40.

43.     In the Fall of 2023, Cannon told Ray that Dunn, Bell's female CEO who is over the age of 40, was "becoming irrelevant" and "out of desperation" tries to jump into business discussions but ultimately looks foolish.

44.     In December of 2023, Cannon repeatedly told Ray that he would rather "shoot [himself] in the face" than to have to travel with Dunn.

45.     Cannon frequently denigrated Bell's Human Resources department, which is led by Bell's SVP of Human Resources Angela Gibbons, a woman over the age of 40 with 32 years of experience in this area. Cannon often called the department "useless".

46.     Cannon also made disparaging comments to Ray about Bell's former in-house HR recruiter, a highly-qualified professional woman over the age of 40 with more than 20 years of experience in recruiting.

8

47.     In one instance, Cannon expressed gross frustration towards the recruiter's work, stating that he needed to "educate her" because she did not understand what a quality candidate looked like for a VP position. Cannon switched to working with an outside recruiting agency and the in-house recruiter left Bell shortly thereafter. The candidate ultimately chosen for the VP position had been identified by the in-house recruiter before she left, but Bell still had to pay the outside agency because of Cannon's decision.

48.     The comments that Cannon made about Bell's CEO, COO, SVP of Human Resources, and in-house recruiter, all women over the age of 40, are but a few examples of the remarks that he made regularly about the women in senior leadership at Bell.

49.     Cannon did not make similar comments about the men in senior leadership at Bell.

50.     Cannon even made comments to Ray about women over the age of 40 who are tangentially related to Bell.

51.     One egregious example is Cannon's misogynistic comments about the wife of Bell's Chief Client Services Officer and member of the Executive Committee. Cannon told Ray that the CCSO's wife was "one of those husband hunters that hung around our fraternity house".

52.     Cannon also made his preference for younger employees clear to Ray.

53.     For example, in the Summer of 2023, when recruiting for an AM vice president, Cannon told Ray that "hiring young folks is the way to go" and younger professionals are more "groomable".

9

54. Likewise, in the Spring of 2023, Cannon encouraged Ray to interview a younger male for an associate position, commenting that he came from "good stock".

55. In the last quarter of 2023, shortly before Cannon put Ray on the performance improvement plan, Cannon hired two younger women as SVPs to report directly to him.

56. Both women were celebrated in press releases, unlike Ray when she was promoted to the SVP of AM and CS role.

57. Cannon's destructive, ageist, and misogynistic behavior is allowed to persist at Bell because Dunn has shielded him from consequences.

58. Given Cannon's ridicule of Dunn, such protection seems undeserved, but makes sense when considering that Cannon previously stepped in to make an internal report about Bell's culture go away following a sexual harassment lawsuit against Dunn by Bell's former Vice President of Risk Management.

59. At an annual officer retreat in late 2017, Dunn sexually harassed the former VP.

60. After the retreat, an internal investigation into the incident, and Bell's culture more broadly, was launched by Bell's SVP of Human Resources at the time, Horace McCormick, who had joined Bell in September of 2017.

61. The former VP also filed suit against Bell and Dunn.

62. While the lawsuit was pending and employees were being deposed, Bell promoted Cannon to Executive Vice President in March of 2018 along with another member of the investment team, Nickolay Bochilo.

10

63.     Cannon and Bochilo had reported directly to Dunn for years and were widely understood to be her right-hand men at Bell.

64.     The lawsuit was eventually settled and the VP that had been sexually harrassed left Bell in August of 2018.

65.     As McCormick was completing a report on his investigation that included suggestions for how Bell needed to address its culture issues, Cannon approached McCormick and told him to shut it down, that Bell was going to just move on.

66.     McCormick tried to push back on Cannon, explaining that Bell needed to take what happened seriously.

67.     Cannon insisted that McCormick shut it down.

68.     Thereafter, McCormick wrapped up his investigation, gave a copy of his findings to Bell's owners, and left Bell in October of 2018.

69.     Cannon's ability to minimize McCormick's robust investigation set the stage for him to discriminate against Ray and take an adverse employment action against her with seeming impunity from Bell.

70.     Moreover, the role of Human Resources at Bell was reconfigured and diminished by Dunn following McCormick's departure and Gibbons starting at Bell as the SVP of Human Resources.

71.     By the time Ray reported Cannon's discriminatory treatment to Gibbons in 2024, Gibbons had little authority to respond appropriately.

72.     Additionally, Cannon often told Ray that the three opinions that mattered at Bell were his, Bochilo's, and Dunn's, a power dynamic that appeared to be legitimized

11

by the response and lack of action following the lawsuit against Dunn.

73.     That reality at Bell is underscored by Executive Chairman Jon Bell's comments to former Bell Chief Operating Officer Gwyneth Cote that Dunn is a bad leader but does more good than harm for Bell financially.

74.     In 2016, Cote had asked Jon Bell to let her know if the company was going to appoint Dunn as President of Bell because Cote did not feel that she could work for Dunn due to Dunn's aggressive, devious, and manipulative leadership style. When Jon Bell informed Cote that he was, in fact, promoting Dunn, he explained to Cote that despite her concerns about Dunn's leadership and Dunn's shortcomings, ultimately Dunn was "net accretive" for the organization's bottomline.

75.     Cote gave notice in early 2017 following Dunn's promotion but Bell kept it quiet and announced her departure as a retirement months later in order to distance Cote's leaving Bell from Dunn's promotion.

**Ray Excelled in Her New Role at Bell Despite Cannon's Unsupportive, Demeaning, and Volatile Management.**

76.     In September of 2022, Ray accepted a new position within the company, Senior Vice President of Asset Management and Construction Services—a role for which she was excited and well-suited.

77.     Ray was selected directly by Bell's ownership group for the role, which would combine and help fill two open leadership seats: the Senior Vice President of Asset Management and the Senior Vice President of Construction Services.

78.     In other words, Bell recognized Ray's history of success and dedication and knew that she could handle the merged responsibilities of not one but two senior vice

12

presidents.

79.    This new position triggered a managerial shift for Ray and she began reporting to the Chief Investment Management Officer, Joesph Cannon.

80.    The Asset Management ("AM") group at Bell is responsible for the following:

> driving asset level performance with particular emphasis on business plan formation and execution in the area of Bell owned renovations/ repositioning, property transitions, and special situations, and a main driver of qualitative property reporting (generally quarterly) and annual budgeting for the Bell Sponsored Portfolio with an emphasis on the New & Exception (NE) portfolio. AM also oversees property tax appeals and the retail components of the Bell Sponsored portfolio and spends significant time assisting with acquisition analysis and property due diligence.

81.    The Construction Services ("CS") group at Bell is responsible for the following:

> the oversight of execution of physical enhancements associated with renovation plans and customary large scale capital expenditure projects across the Bell owned and third-party portfolio. In addition, the group is charged with physical analysis during due diligence to evaluate future capital needs, code compliance, and long-term structural integrity (along with related issues).

82.    Cannon had overseen both the AM group and the CS group since 2020 and had managed both groups directly for almost nine months after the previous SVP of AM left Bell in early 2022 and the SVP of CS position had been vacant since early 2021.

83.    Prior to her transition, Cannon told Ray that the vice presidents running each group were strong and highly capable but perhaps needed some oversight and

13

guidance and that both teams were generally in good shape.

84.     Ray quickly realized that was not the case.

85.     Immediately upon stepping into her role as SVP of AM and CS, Ray found both groups in a state of disarray, particularly the AM group.

86.     The executives running the AM group had struggled under Cannon's condescending and neglectful leadership: the AM West group's vice president left shortly after Ray stepped in (indicating that she had already been searching for new employment) and the AM East group's vice president was overwhelmed to the point that he was suffering from panic attacks.

87.     Several team members shared that they felt unsupported and confused about the direction and goals that Cannon had set out for them—a few even specifically asked for Ray to create a buffer between them and Cannon.

88.     In addition to the personnel struggles, Ray discovered a number of issues in the AM group that likely resulted from poor oversight:

        a.     Bell's capital expenditures (which the AM group was responsible for managing) had been overbudget by 20 − 40% for nearly five years;

        b.     The Final Asset Plan for a large real estate deal closed in early 2022 was unusable, had loan covenant issues, and had to be redone;

        c.     The team lacked processes and procedures outside of those for underwriting and renovations; and

        d.     Annual and quarterly reviews for associates were not being

14

conducted consistently, meaning that the team at large had little to no understanding of where or how to improve.

89.    Although the CS group was in better operational shape than the AM group, it likewise had a few issues that Ray had to correct:

        a.    The 2022 Corporate Goal that Bell set for Construction had been wholly neglected; and

        b.    The contracts and related fee structure for the largest CS client were inconsistent across projects and more crucially, the most profitable and higher fee projects were ending and replacement projects did not have established fee terms, making profitability unpredictable and staff resource planning risky.

90.    Despite taking over groups plagued with various issues, Ray endeavored to right the ship quickly and provide a source of steady guidance and encouragement for her teams.

91.    Ray did so while continuing to provide significant support to the Financial Services group as her previous SVP of Financial Services position was not filled until April of 2023.

92.    Ray also covered needs in the Investor Relations area as the previous female SVP of Investor Relations (who had reported directly to Cannon) had left Bell after only about six months and the position had remained vacant for several months.

93.    In addition to her managerial role and pulling double duty for other groups within Bell, Ray was responsible for her own projects within the AM and CS groups

15

such as: casualty loss oversight, property tax database creation, due diligence underwriting support, staff recruitment, leadership development, and both asset and department budgets.

94.     Ray was highly proficient as the SVP of AM and CS, accomplishing much both in and out of her defined job description.

95.     A top measure of success at Bell is completing corporate goals that are established by Bell's Executive Committee. Completion isn't the only objective; Bell scores how and to what degree the corporate goals are completed on a 100-point scale, with top marks considered to be between 90-95% and a perfect 100% considered to be a rare feat.

96.     In 2022 and 2023, Ray completed three corporate goals with top marks in two different areas:

      a.     In Financial Services, Ray retained a 2022 corporate goal (after she stepped into the SVP of AM and CS role) related to a new system rollout of property-level budgets. She completed this goal with a 95%. Moreover, this project had been a corporate goal in prior years under other leaders and was not successfully completed until Ray and her team did so with outstanding results.

      b.     In Construction Services, Ray inherited a 2022 corporate goal related to reporting and managed to completed this goal with a 90% in only three short months.

      c.     Also in Construction Services, Ray and her team completed a

16

2023 corporate goal related to construction metrics and dashboards with a perfect 100%.

97.     These corporate goals are but a small window into how productive Ray was in her 18 months as the SVP of AM and CS. Among other accomplishments, Ray:

  a. Developed and rolled out a playbook for a traditional, wholisitic asset management function for the AM group where Bell's AM teams had previously focused primarily on quarterbacking renovations;

  b. Addressed and resolved the capital expenditure budget overages by developing a new process, workflow, and training program. Such a project would typically have been made a corporate goal but given the urgency of the problem, Ray and her AM team implemented this initiative on an accelerated timeline of less than 3 months;

  c. Created a new tracking and reporting protocol for the AM group in 2023 and 2024 that is still being used to report to the Executive Committee during Monthly Financial Reviews;

  d. Led the AM group to drive tremendous growth in 2023 as a top performer compared to other real estate investment trusts as evidenced in the internal REIT comparison reports; and

  e. Led the CS group during its largest and most profitable year in 2023 all the while revamping the construction contract administration team, mapping out the CS group's processes to ensure longterm sustainability, and addressing and renegotiating contract terms with

17

clients.

98.     Ray accomplished all of this without adequate resources and support from Cannon and while dealing with his demeaning approach as a manager.

99.     For example, after Ray was tasked with transitioning the AM group from managing renovations to running a wholistic asset management program (a major shift requiring buy-in from multiple departments managed by other EC members, significant shifts in authority of those groups, and significant process updates), she asked for but was refused direct sponsorship from the Executive Committee by Cannon, who told Ray to "carry her own football"—in other words that she needed to get this done herself.

100.     Cannon also changed his expectations for Ray and those she managed constantly.

101.     Ray got a window into Cannon's propensity for angry outbursts and abusive management early on when his shifting expectations were not met at an AM and Investor Relations combined retreat in November of 2022.

102.     At the last minute, Cannon decided to have junior associates present on Bell's property assets in Denver, where the retreat was being held, but gave no specific guidance and did not acknowledge that these associates were ill-equipped for this assignment as this was not their market nor their primary responsibility.

103.     During the combined asset tour and presentation, Cannon pulled Ray aside. He was fuming and felt that the associates had done a horrible job. Ray was shocked at his level of rage. Cannon wanted to immediately eviscerate the associates in front of the team, but Ray tried to calm him down and ask that his disappointment be

18

expressed later, especially given the lack of direction and short timeframe.

104.   Cannon agreed reluctantly but later changed his mind and unleashed on the associates' supervisors, the two AM VPs. Ray had to do significant damage control with her AM team.

105.   Within a month of this incident, one VP had left Bell and the other was suffering from panic attacks.

106.   In addition to specific incidents, Cannon often provided both erratic and sporadic instructions and spoke to Ray in a condescending manner.

107.   All of this left Ray in a constant state of viligance in order to deal with Cannon's volatile moods, shifting expectations, and disparaging treatment of her and the people that she managed.

**Cannon Put Ray on a Performance Improvement Plan in February of 2024.**

108.   Despite Ray excelling in her role, Cannon took aim at Ray because she is a woman above a certain age.

109.   Such stellar performance like Ray's would normally be met with praise or appreciation by a manager.

110.   Instead, after a year and a half of achievement by Ray, Cannon put Ray on a PIP in early February of 2024 and required her to meet with an outside consultant, Tillie Harris, for executive coaching.

111.   Cannon initially told Ray in December of 2023 that Harris was going to be a training resource for the AM group.

112.   Cannon directed Ray to meet with the AM VPs before the year ended to

19

discuss goal setting for 2024 and to set a schedule for team training sessions with Harris in the first quarter of 2024.

113. Despite managing end-of-year budget setting and the implementation of a massive capital tracking system, Ray nevertheless followed Cannon's instructions, even finding time to meet with her AM VPs in-person despite busy holiday schedules.

114. Ray accordingly thought that she was getting an external resourse that could observe the chaos that Cannon's leadership created and be an advocate for her and her teams with Bell's Executive Committee.

115. That changed in February of 2024 when Cannon decided that it was Ray who needed to be "fixed".

116. After the AM group held an initial meeting in January in anticipation of working with Harris (where Ray provided her team copies of the book "Radical Candor" by Kim Scott as requested by Cannon), Cannon pivoted and told Ray that she had to start working with Harris one-on-one immediately.

117. Cannon in fact told Ray, when communicating his decision to put Ray on a PIP, that Ray needed to work with "a professional", that he did not deal with "mental issues" and only dealt with the "business stuff", and that she needed to fix things before the end of the first quarter.

118. Ray had been struggling mentally and physically because of the stress caused by working for Cannon, but she had striven to ensure that her work product and managerial duties did not falter.

119. As evidenced by her accomplishments since she transitioned to the SVP of

20

AM and CS role, her performance was not a problem and there was no reason for her to be put on a PIP with an ultimatium attached.

120. Frustrated at the unfair treatment, Ray nevertheless endeavored to work sincerely with Harris to try and achieve the shifting standards set by Cannon.

121. Ray had to forego the remaining training sessions for the AM group and had three sessions with Harris in approximately two weeks, as Harris had expressed that time was of the essence.

122. Unsurprisingly, given the baseless nature of the PIP, Harris did not focus on the quality or actual substance of Ray's work, rather she recommended strategies for how to appease Cannon.

123. After the first few sessions, Harris shared her notes and recommendations for how Ray needed to improve her "performance".

124. In her notes, Harris stated that Ray should not let Cannon know about the stress and anxiety caused by working under him and to instead ensure that Cannon witnessed every success achieved by Ray.

125. Such critiques were nonsensical as Ray had already demonstrated a clear track record of achievement.

126. Ultimately, Harris informed Ray of the following: "you recognize that you have a short period of time to reassure Joe that you're going to deliver what he needs and lead in a way that he needs you to."

127. Harris also told Ray that according to Cannon she had a short period of time in which to "get funded".

128. Understandably confused about what this meant, Harris explained to Ray that Cannon had decided to treat Ray like a start-up founder who had to prove that she was worth investing in.

129. This expectation revealed that Cannon had already decided to force Ray out and there was nothing that Ray could do to prevent that end.

130. Placing her on the PIP and assigning her to work with an outside consultant was Cannon's attempt to cover up his true motivation: pushing Ray out because she was an older female executive.

131. Ray was the only executive at Bell assigned by Cannon to work with Harris one-on-one.

132. At the time, there were no other women over the age of 40 reporting directly to Cannon.

133. After suffering from increasingly severe physical symptoms due to the stress of Cannon's behavior and discrimination, Ray was placed on medical leave by her physician on March 11.

134. Ray's medical leave was long overdue, but she had previously refrained from taking the necessary leave for fear of retribution by Cannon.

135. Already concerned about Cannon's lack of compassion for the mental and physical health of his team, Ray had tried to hint at the decline in her physical health to Cannon in the middle of 2023.

136. Shortly after that conversation, Cannon expressed his frustration over another female team member taking medical leave after a promotion, stating that she

22

had a "f**king mental breakdown."

137.    Such a response did nothing at the time to allay Ray's concerns about taking medical leave and only heightened her worries that she would face some form of retaliation from Cannon if she took medical leave, so instead Ray continued working under his destructive behavior until she reached a breaking point.

## Bell Knew About Cannon's Discriminatory Treatment of Ray, But Took No Action to Stop Him.

138.    Bell had notice of Cannon's discriminatory treatment of Ray and knew when Cannon put Ray on the PIP.

139.    Ray met with Bell's SVP of Human Resources, Angela Gibbons, several times to express her concerns about Cannon's behavior and the detrimental affect it was having on her.

140.    In one particular incident, during the Spring of 2023, Ray was assisting Cannon with a key investor presentation in Washington D.C. Cannon's management during this trip was particularly erratic and abusive, which was typical of Cannon during stressful events, so Ray contacted Gibbons and asked for a call.

141.    During her conversation with Ray, Gibbons acknowledged Cannon's behavior and stated that the environment at Bell was toxic.

142.    Ultimately Gibbons said that she had no authority to fix the situation and advised that Ray's best course of action would be to leave Bell.

143.    These sentiments were reiterated during additional conversations between Ray and Gibbons towards the end of 2023 and beginning of 2024, including after Ray had been placed on the PIP.

23

144.   Ray and Gibbons had a lunch meeting in February of 2024 in which Gibbons again advised Ray that she just needed to get out.

145.   Additionally, in November of 2023, at Bell's annual officer retreat, Ray spoke with Bell's female SVP of Operations, Kristin Stanton, who expressed concern over Ray's physical and mental health and encouraged Ray to take medical leave.

146.   Stanton had also previously shared her concerns with Ray over Cannon's treatment of women at Bell.

147.   Ray told Stanton that she feared retribution from Cannon, perhaps even the end of her career at Bell, if she took medical leave.

148.   Then, in February of 2024, Ray requested a meeting with the Bell's Chief Financial Officer and member of Executive Committee John Tomlinson, her former supervisor, to relay the physical and mental distress that she was suffering from working under Cannon.

149.   Ray also told Tomlinson that Cannon was trying to push her out of Bell and had assigned her to work one-on-one with Harris.

150.   Tomlinson acknowledged that Cannon's behavior was not appropriate, but also told Ray that things would not change given the current power structure at Bell.

151.   Tomlinson recommended that Ray remove herself from the unhealthy situation and negotiate a fair exit but also advised her to avoid taking legal action like Bell's former Risk Officer.

152.   Such a response typified the message that Ray was receiving from those she reported her suffering and Cannon's discriminatory treatment to: nothing's going

to change at Bell and nothing can be done about Joe, so you just need to get out.

153.    That she had taken steps to report what was happening to her and nothing was done about it left Ray powerless to remedy the discrimination that she was facing at Bell.

154.    Ray was therefore left with no choice but to resign in order to preserve her own health and wellbeing.

## FIRST CLAIM: DISPARATE TREATMENT BASED ON GENDER
### Against Defendants Bell and Cannon
(*in Violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.*)

155.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

156.    While employed at Bell, Ray was treated disparately based on her gender.

157.    Ray is a member of a protected class, as she is a female.

158.    Ray was qualified to perform the duties of her job.

159.    Ray performed the essential functions of her job at an exceptional level and regularly exceeded expectations.

160.    Ray suffered an adverse employment action when Cannon put her on a performance improvement plan that other employees in similar positions were not required to undergo.

161.    Bell intentionally discriminated against Ray by allowing its employee, Cannon, to engage in widely known inappropriate conduct and place her on a performance improvement plan.

162.    Bell allowed Cannon to make disparaging comments and disrespect Ray

25

and other female employees, particularly women over the age of 40 years old.

163.  Although numerous members in senior management were put on notice of Cannon's misconduct towards Ray, Bell did not take action to abate the disparate treatment.

164.  When Ray issued internal complaints to members of Bell's Executive Committee and senior leadership, she was told things would not change and that she should leave Bell.

165.  The overall circumstances of Ray's treatment at Bell and by Cannon gives rise to a strong inference of gender discrimination and disparate treatment based on gender in violation of Title VII.

166.  As a direct result of Bell and Cannon's gender discrimination, Ray has been injured and suffered damages, including emotional distress and wage and benefits losses.

**<u>SECOND CLAIM: DISPARATE TREATMENT BASED ON AGE</u>**
**<u>Against Defendants Bell and Cannon</u>**
(*in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.*)

167.  Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

168.  Ray was a member of a protected class as she was over 40 at the time of she was discriminated against.

169.  Ray was qualified to perform the duties of her job.

170.  Ray performed the duties of her job at a high level.

171.  Despite a satisfactory record and several documented accomplishments,

26

Ray suffered an adverse employment action when Cannon put her on a performance improvement plan.

172.    Other younger employees at Bell were not put on a similar plan.

173.    Bell intentionally discriminated against Ray by allowing its employee, Cannon, to engage in widely known inappropriate conduct and put her on a performance improvement plan.

174.    Bell allowed Cannon to make disparaging comments and disrespect Ray and other older employees, particularly women over the age of 40 years old.

175.    Although numerous members in senior management were put on notice of Cannon's misconduct towards Ray, Bell did not take action to abate the disparate treatment.

176.    When Ray issued internal complaints to members of Bell's Executive Committee and senior leadership, she was told things would not change and that she should leave Bell.

177.    The overall circumstances of Ray's treatment at Bell and by Cannon gives rise to a strong inference of age discrimination and disparate treatment based on age in violation of Title VII.

178.    As a direct result of Bell and Cannon's unlawful discriminatory actions based on age, Ray sustained a substantial amount of damages, including emotional distress and wage and benefits losses.

27

## THIRD CLAIM: HOSTILE WORK ENVIRONMENT
## Against Defendants Bell and Cannon
*(in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.)*

179.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

180.    While employed by Bell, Ray and other women were subjected to persistent verbal harassment by Cannon.

       a.    Cannon stated that Ray had "mental issues" and that needed to be fixed.

       b.    Cannon regularly spoke in a condescending tone through emails and verbal exchanges with Ray.

       c.    Women at Bell confided in Ray about Cannon's disrespect for women at the company.

181.    Cannon's conduct was so severe that the manner of Ray's employment changed. Ray feared retribution for asking for normal workplace operations, such as medical leave.

182.    Ray's physical and mental health declined as a direct result of Cannon's hostility.

183.    Cannon's inappropriate sexist, ageist, and hostile comments about women over the age of 40 created a hostile work environment for Ray.

184.    Members of Bell's Executive Committee and senior management were aware of Cannon's conduct. Yet, no corrective action was taken by Bell once they became aware of Ray's concerns.

28

185.    Members of the Executive Committee and senior management did not exercise reasonable care in rectifying the hostile work environment Cannon created.

186.    Ray was ultimately forced to resign in order to preserve her physical and mental health and wellbeing.

187.    Ray suffered damages as a result of this hostile work environment, including but not limited to emotional distress.

### FOURTH CLAIM: CONSTRUCTIVE DISCHARGE
### Against Defendant Bell
*(in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.)*

188.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

189.    Ray, a member of protected classes as a woman over the age of 40, was constructively discharged from her employment at Bell.

190.    Ray was performing her job at a level that met Bell's legitimate expectations.

191.    The conditions of her employment had become sufficiently intolerable such that a reasonable person would feel compelled to end their employment.

192.    The cumulative effect of Cannon's treatment of Ray, including his offensive comments about women over the age of 40, his baseless decision to put Ray on a performance improvement plan, and Bell's lack of action and sanctioning of Cannon's behavior forced Ray's resignation.

193.    Ray resigned effective April 8, 2024.

194.    At the time she resigned, Ray was not permitted to make a free choice

29

regarding her employment as Cannon had already decided that he was going to terminate her employment and was using the performance improvement plan as a cover.

195.    Bell failed to try and prevent Ray's resignation.

196.    Instead several members of Bell's senior leadership acknowledged Cannon's behavior and told Ray that she should leave Bell.

197.    The effect of Bell's actions was to cut short Ray's long and successful career at Bell, deprive her of equal employment opportunities, and otherwise adversely affect her status as an employee because of her age and gender.

198.    Ray sustained a substantial amount of damages as a result of her constructive discharge, including wage and benefits losses and emotional distress.

### FIFTH CLAIM: CONSTRUCTIVE WRONGFUL DISCHARGE BASED ON HOSTILE WORK ENVIRONMENT
### Against Defendant Bell
(*in Violation of North Carolina law*)

199.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

200.    Ray was performing her job at a level that met Bell's legitimate expectations.

201.    The conditions of her employment had become sufficiently intolerable such that a reasonable person would feel compelled to end their employment.

202.    The cumulative effect of Cannon's treatment of Ray, including his offensive comments about women over the age of 40, his baseless decision to put Ray on a performance improvement plan, and Bell's lack of action and sanctioning of Cannon's

30

behavior forced Ray's resignation.

203.     Ray resigned effective April 8, 2024.

204.     At the time she resigned, Ray was not permitted to make a free choice regarding her employment as Cannon had already decided to force Ray to leave and that he was going to terminate her employment and was using the performance improvement plan as a cover.

205.     Bell failed to try and prevent Ray's resignation.

206.     Instead several members of Bell's senior leadership acknowledged Cannon's behavior and told Ray that she should leave Bell.

207.     The effect of Bell's actions was to cut short Ray's long and successful career at Bell.

208.     Ray sustained a substantial amount of damages as a result of her constructive wrongful discharge, including wage and benefits losses and emotional distress.

## SIXTH CLAIM: CONSTRUCTIVE WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### Against Defendant Bell
*(in Violation of North Carolina law)*

209.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

210.     North Carolina law holds that an employer has no right to terminate an at-will employment contract for an unlawful reason or purpose that contravenes public policy.

211.     Public policy is the principle of law that holds that no citizen can

31

lawfully do that which tends to be injurious to the public or against the public good.

212.    Under N.C. Gen. Stat. § 143-422.2(a), the North Carolina Equal Employment Practices Act, "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees."

213.    Bell violated the public policy of North Carolina as set forth in N.C. Gen. Stat. § 143-422.2(a) by permitting Cannon's discriminatory actions and leaving Ray with no choice but to resign.

214.    Cannon's motivation in forcing Ray out of Bell violated this public policy.

215.    Ray resigned effective April 8, 2024.

216.    At the time she resigned, Ray was not permitted to make a free choice regarding her employment as Cannon had already decided to force Ray to leave and that he was going to terminate her employment and was using the performance improvement plan as a cover.

217.    Ray sustained a substantial amount of damages as a result of her constructive wrongful discharge, including wage and benefits losses and emotional distress.

### SEVENTH CLAIM: TORTIOUS INFERENCE
### Against Defendant Cannon
(*in Violation of North Carolina law*)

218.    Plaintiff re-alleges and incorporates the prior paragraphs of this

32

Complaint as if fully set forth herein.

219.    Though terminable at will, Ray's employment with Bell was a contractual relationship under North Carolina common law.

220.    Cannon was aware that Ray was employed by Bell as Cannon was Ray's direct supervisor.

221.    Cannon intentionally and maliciously interfered with Ray's regular course of work at Bell by failing to provide adequate support and staffing, managing Ray in a demeaning, hostile, and discriminatory manner, and putting Ray on a performance improvement plan as a cover for his plan to force her out of Bell.

222.    Cannon had no legitimate business purpose for his interference with Ray's employment contract with Bell.

223.    As a direct and proximate result of Cannon's interference with her employment contract, Ray has suffered a substantial amount of damages, including wage and benefits losses and emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Allison Ray prays the Court for the following relief:

1.    That Bell be ordered to pay Ray back pay and benefits with interest and emotional distress damages;

2.    That Bell be required to pay Ray front pay and benefits in the event reinstatement does not occur;

3.    That Ray be awarded attorneys' fees and costs as allowed by law;

4.    That Ray be awarded punitive damages; and

33

5.     That the Court award Ray such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted, the 24th day of October, 2024.

/s/ *Matthew E. Lee*
Matthew E. Lee
Jeremy R. Williams
Katharine W. Batchelor
**MILBERG COLEMAN
BRYSON
PHILLIPS GROSSMAN
PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mlee@milberg.com
jwilliams@milberg.com
kbatchelor@milberg.com

*Counsel for Plaintiff*

34