IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ALLISON RAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:24-cv-00882-SDT-JEP |
| | ) |
| BELL PARTNERS INC. and JOSEPH F. CANNON, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION & ORDER

THACKER, Circuit Judge (sitting by designation):

In this employment discrimination action, Plaintiff Allison Ray alleges that her former employer, Bell Partners Inc. ("Bell") and supervisor, Joseph F. Cannon ("Cannon") (together with Bell, "Defendants"), discriminated against her on account of her age and gender, ultimately forcing her to resign. Defendants moved to dismiss Plaintiff's Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons detailed further below, Defendants' motion is GRANTED and Plaintiff's federal claims are dismissed **with prejudice**. The court declines to exercise supplemental jurisdiction over Plaintiff's pendent claims alleging violations of state law. Accordingly, those claims are dismissed **without prejudice**.

I.

A.

The following facts are taken from Plaintiff's Amended Complaint. For the purposes of the motion to dismiss, the court accepts the allegations contained in the

1

Amended Complaint as true and draws all reasonable inferences in Plaintiff's favor. *Barbour v. Garland*, 105 F.4th 579, 582 (4th Cir. 2024).

Defendant Bell is a nationwide real estate investment and management company headquartered in Greensboro, North Carolina that focuses on multi-family rental communities throughout the United States. In 2007, Bell hired Plaintiff as a senior corporate accountant. Plaintiff was promoted multiple times over the following years to vice president roles, and then to senior vice president roles within Bell. She consistently exceeded both internal and external metrics for performance, staff engagement, and employee satisfaction. Indeed, in her annual performance reviews, she earned "meets expectations" or "exceeds expectations" scores across the board, year after year. Am. Compl. ¶ 31.

In 2022, when Plaintiff was more than forty years old, she accepted a new position at Bell as Senior Vice President for the Asset Management and Construction Services groups. The Asset Management group at Bell is responsible for driving asset level performance, qualitative property reporting, managing specific portfolios, and handling property tax appeals, among other things. The Construction Services group is responsible for overseeing renovation projects, physical analysis during due diligence to evaluate capital needs, and code compliance, among other things. As part of her new role, Plaintiff reported directly to Cannon, who was the Chief Investment Management Officer. Cannon had served in this role since 2020 and had managed both the Asset Management and Construction Services groups directly for nine months prior to Plaintiff joining his team.

Prior to Plaintiff coming on board, Cannon told Plaintiff that the teams were "generally in good shape" but "perhaps needed some oversight and guidance." Am. Compl. ¶ 83.

Upon stepping into her role, Plaintiff found "both groups in a state of disarray." Am. Compl. ¶ 85. One of the vice presidents she supervised left the company shortly after Plaintiff came on board. And another was "overwhelmed to the point that he was suffering from panic attacks." Am. Compl. ¶ 86. Several members of Plaintiff's team "shared that they felt unsupported and confused about the directions and goals that Cannon had set out for them." Am. Compl. ¶ 87. A few even specifically "asked for [Plaintiff] to create a buffer between them and Cannon." Am. Compl. ¶ 87.

In addition to the personnel related issues, Plaintiff was confronted with several operational problems in both of her new groups. For example, the Asset Management group was nearly 20–40% over budget for capital expenditures, lacked necessary processes and procedures, and had inconsistent review procedures for associates. Moreover, a large real estate deal that had closed in 2022 was "unusable, had loan covenant issues, and had to be redone." Am. Compl. ¶ 88. Similarly, the Construction Services group had inconsistent fee structures across projects and had "neglected" its "2022 Corporate Goal." Am. Compl. ¶ 89.

Despite these issues, Plaintiff "endeavored to right the ship quickly and provide a source of steady guidance and encouragement for her teams." Am. Compl. ¶ 90. Plaintiff received "top marks" for her "corporate goals" in Construction Services in both 2022 and 2023, leading the group to its largest and most profitable year to date. Am. Compl. ¶¶ 95–97. Plaintiff also resolved the capital expenditure budget overages, created new tracking

and reporting protocols, and drove growth in the Asset Management group. Plaintiff accomplished all of this while still providing "continuing significant support" to her prior group, which did not find a replacement for Plaintiff until April 2023. Am. Compl. ¶ 91.

Notwithstanding her professional achievements, Plaintiff suffered under Cannon's "demeaning approach as a manager." Am. Compl. ¶ 98. Cannon, in addition to being a chief officer at Bell, is also "a part owner of [Bell], and a favored executive by Bell's Chief Executive Officer Lili Dunn." Am. Compl. ¶ 32. Cannon frequently told Plaintiff that he was one of "three opinions that mattered at Bell," Am. Compl. ¶ 72, alongside Dunn and another one of Dunn's "right-hand men," Nickolay Bochilo, Am. Compl. ¶ 63.

Per the Amended Complaint, "no employee or executive at Bell who ever reported directly to Cannon survived more than two years of doing so and were either transferred to other positions and supervisors within Bell or left their jobs at Bell altogether." Am. Compl. ¶ 35. For example, the previous "Manager of Portfolio Management, a woman, had to take medical leave for health reasons after reporting to Cannon for approximately two years." Am. Compl. ¶ 36. Another senior vice president, also a woman, left Bell "after directly reporting to Cannon for only about six months." Am. Compl. ¶ 39.

During the time Plaintiff worked for Cannon, he made several "offensive comments . . . about other older women in senior management at Bell." Am. Compl. ¶ 40. Specifically, Cannon told Plaintiff that "Bell's Chief Operating Officer[,] Cindy Clare[,] was a 'joke' and a 'disaster' and that the company needed to get rid of her but that it was 'not a good time to trade out horses.'" Am. Compl. ¶ 41. According to Plaintiff, these

4

comments were "typical of Cannon's biased opinion of Clare[,] who [wa]s a woman over the age of 40." Am. Compl. ¶ 42.

Additionally, in the fall of 2023, Cannon told Plaintiff that Dunn, Bell's female CEO who was over the age of 40, was "'becoming irrelevant' and 'out of desperation' tries to jump into business discussions but ultimately looks foolish." Am. Compl. ¶ 43. In December 2023, Cannon "repeatedly" told Plaintiff that he would rather 'shoot [himself] in the face' than to have to travel with Dunn." Am. Compl. ¶ 44. Cannon also "frequently denigrated Bell's Human Resources department, which is led by Bell's [Senior Vice President] of Human Resources[,] Angela Gibbons, a woman over the age of 40." Am. Compl. ¶ 45. Cannon "often called the department 'useless.'" Am. Compl. ¶ 45.

Cannon also made "disparaging comments to [Plaintiff] about Bell's former in-house [Human Resources] recruiter, a highly-qualified professional woman over the age of 40." Am. Compl. ¶ 46. In one instance, Cannon "expressed gross frustration towards the recruiter's work, stating that he needed to 'educate her' because she did not understand what a quality candidate looked like for a [vice president] position." Am. Compl. ¶ 47.

These comments about Bell's chief executive officer, chief operating officer, senior vice president of human resources, and in-house recruiter, all women over the age of 40, were "but a few examples of the remarks that [Cannon] made regularly about the women in senior leadership at Bell." Am. Compl. ¶ 48. According to Plaintiff, Cannon "did not make similar comments about the men in senior leadership at Bell." Am. Compl. ¶ 49.

Cannon "also made his preference for younger employees clear to [Plaintiff]." Am. Compl. ¶ 52. For example, in the summer of 2023, while Bell was recruiting for a vice

5

president position in the Asset Management group, Cannon told Plaintiff "hiring young folks is the way to go" and that younger professionals were more "groomable." Am. Compl. ¶ 53. And, in the Spring of 2023, Cannon "encouraged [Plaintiff] to interview a younger male for an associate position, commenting that he came from 'good stock.'" Am. Compl. ¶ 54.

Finally, Plaintiff alleges that Cannon treated Plaintiff worse than other younger, similarly situated employees. Specifically, Plaintiff alleges that in the last quarter of 2023, Cannon "hired two younger women as [senior vice presidents] to report directly to him." Am. Compl. ¶ 55. Both women were "celebrated in press releases," Am. Compl. ¶ 56, whereas Plaintiff did not receive similar treatment when she was promoted to Senior Vice President for the Asset Management and Construction Services groups.

Plaintiff reported Cannon's misconduct to Bell several times. In Spring of 2023, when Cannon was "particularly erratic and abusive" after an investor presentation in Washington D.C., Plaintiff reported Bell's conduct to Gibbons. Am. Compl. ¶ 140. Gibbons "acknowledged Cannon's behavior and stated that the environment at Bell was toxic." Am. Compl. ¶ 141. Nonetheless, Gibbons said that she had "no authority to fix the situation and advised that [Plaintiff]'s best course of action would be to leave Bell." Am. Compl. ¶ 142. Gibbons reiterated these sentiments "during additional conversations between [Plaintiff] and Gibbons towards the end of 2023 and beginning of 2024." Am. Compl. ¶ 143.

Additionally, in November 2023, at an annual retreat, Plaintiff spoke with the female Senior Vice President of Operations, Kristin Stanton, who "expressed concern over

6

[Plaintiff]'s physical and mental health and encouraged [Plaintiff] to take medical leave." Am. Compl. ¶ 145. But Plaintiff told Stanton that "she feared retribution from Cannon, perhaps even the end of her career at Bell, if she took medical leave." Am. Compl. ¶ 147. Plaintiff had tried to hint at "the decline in her physical health to Cannon in the middle of 2023." Am. Compl. ¶ 135. But shortly after, Cannon "expressed his frustration over another female team member taking medical leave after a promotion, stating that she had a 'f***ing mental breakdown.'" Am. Compl. ¶ 136.

In early February 2024, Cannon put Plaintiff on a Performance Improvement Plan ("PIP") and required Plaintiff to meet with an outside consultant, Tillie Harris, for executive coaching. Prior to putting Plaintiff on the PIP, Cannon told Plaintiff that Harris was going to be a training resource for her Asset Management group. Accordingly, Cannon directed Plaintiff to meet with the vice presidents in her group at the end of 2023 to "set a schedule for team training sessions with Harris in the first quarter of 2024." Am. Compl. ¶ 112. But after the Asset Management group "held an initial meeting in January in anticipation of working with Harris . . . Cannon pivoted and told [Plaintiff] that she had to start working with Harris one-on-one immediately" as part of her PIP. Am. Compl. ¶ 116.

In communicating his decision to put Plaintiff on the PIP, Cannon told Plaintiff that "she needed to fix things before the end of the first quarter." Am. Compl. ¶ 117. At this time, Plaintiff had been "struggling mentally and physically because of the stress caused by working for Cannon." Am. Compl. ¶ 118. Frustrated at the "unfair treatment, [Plaintiff] nevertheless endeavored to work sincerely with Harris to try and achieve the shifting

7

standards set by Cannon." Am. Compl. ¶ 120. Accordingly, Plaintiff "had three sessions with Harris in approximately two weeks, as Harris had expressed that time was of the essence." Am. Compl. ¶ 121.

Plaintiff's sessions with Harris "did not focus on the quality or actual substance of [Plaintiff]'s work." Am. Compl. ¶ 122. Rather, Harris "recommended strategies for how to appease Cannon." Am. Compl. ¶ 122. After the first few sessions, Harris informed Plaintiff that she could improve by not letting Cannon "know about the stress and anxiety caused by working under him and to instead ensure that Cannon witnessed every success achieved by [Plaintiff]." Am. Compl. ¶ 124. Harris informed Plaintiff, "you recognize that you have a short period of time to reassure [Cannon] that you're going to deliver what he needs and lead in a way that he needs you to." Am. Compl. ¶ 126.

Harris also told Plaintiff that according to Cannon, Plaintiff had a short period of time in which to "get funded." Am. Compl. ¶ 127. When Plaintiff asked what this meant, Harris explained that Cannon had "decided to treat [Plaintiff] like a start-up founder who had to prove that she was worth investing in." Am. Compl. ¶ 128. Plaintiff took this to mean that Cannon had put Plaintiff on the PIP and assigned her to work with Harris to cover up his true motivation: "pushing [Plaintiff] out because she was an older female executive." Am. Compl. ¶ 130.

Plaintiff requested a meeting with the chief financial officer for Bell, John Tomlinson, "to relay the physical and mental distress that she was suffering from working under Cannon." Am. Compl. ¶ 148. Plaintiff told Tomlinson that Cannon was "trying to push her out of Bell and had assigned her to work one-on-one with Harris." Am.

8

Compl. ¶ 149. Tomlinson acknowledged that Cannon's behavior was inappropriate, but told Plaintiff that "things would not change given the current power structure at Bell." Am. Compl. ¶ 150. Tomlinson recommended that Plaintiff "negotiate a fair exit but also advised her to avoid taking legal action." Am. Compl. ¶ 151.

In the beginning of March 2024, Plaintiff was "increasingly suffering emotionally and physically from the strain of working for Cannon and trying to give the PIP her best shot even while knowing that her efforts were likely futile." Am. Compl. ¶ 155. Therefore, Plaintiff "began having conversations with Cannon about what it would look like for her to leave Bell." Am. Compl. ¶ 156. Plaintiff alleges that Cannon "took these conversations and used them against [her]." Am. Compl. ¶ 157. According to Plaintiff, Cannon "spun a narrative" to the other executives at Bell "about [Plaintiff] not being able to handle feedback." Am. Compl. ¶ 158. Plaintiff subsequently received a call from Dunn who told Plaintiff that she heard "[Plaintiff] wasn't handling criticism well but said that it's a free country so [Plaintiff] could leave if her feelings had gotten hurt." Am. Compl. ¶ 159.

Cannon also told "executives at Bell that [Plaintiff] had resigned," when she had not. Am. Compl. ¶ 158. Plaintiff found out that Cannon had so advised the executives when she received a call from Gibbons, who told Plaintiff that "Cannon had reported to the Executive Committee that [Plaintiff] had resigned and was preparing to offer her no severance." Am. Compl. ¶ 160. Because Plaintiff "unequivocally had not resigned her employment at that point, . . . [she] email[ed] Bell executives telling them the same." Am. Compl. ¶ 161. On March 11, 2024, the day after Plaintiff informed her supervisors that she had not resigned, "[Plaintiff's] doctor placed her on medical leave." Am.

9

Compl. ¶ 163. Due to Cannon's "unlawful treatment of [Plaintiff], including [Cannon's] manipulative push to get [Plaintiff] to resign by telling multiple Bell executives that [Plaintiff] had resigned when she had not, [Plaintiff] resigned at the end of her medical leave because she did not believe that she had any other choice." Am. Compl. ¶ 164.

B.

Plaintiff's resignation became effective on April 8, 2024. On July 5, 2024, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Dismissal and Notice of Rights on August 14, 2024. On October 24, 2024, Plaintiff filed this lawsuit.

On November 14, 2024, Plaintiff filed her operative Amended Complaint. The Amended Complaint alleges six claims for relief: (1) disparate treatment based on gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") against Bell; (2) disparate treatment based on age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (the "ADEA") against Bell; (3) hostile work environment in violation of Title VII and the ADEA against Bell; (4) constructive discharge in violation of Title VII and the ADEA against Bell; (5) tortious interference in violation of North Carolina law against Cannon; and (6) negligent supervision and retention in violation of North Carolina law against Bell.

On January 2, 2025, Defendants filed a motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) and Local Rule 7.1. That motion became ripe on February 5, 2025.

II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "a plaintiff must provide sufficient detail to show that [s]he has a more-than-conceivable chance of success on the merits." *Decoster v. Becerra*, 119 F.4th 332, 337 (4th Cir. 2024) (citation omitted). Legal conclusions or conclusory statements do not suffice. *Iqbal*, 556 U.S. at 678.

III.

A.

The court turns first to Plaintiff's claims against Bell of disparate treatment pursuant to her gender and age, in violation of Title VII and the ADEA, respectively.

As the Fourth Circuit has repeatedly emphasized, "[i]t has long been the rule that 'an employment discrimination plaintiff need not plead a prima facie case of discrimination' under the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to withstand a motion to dismiss." *Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002)). Rather, the inquiry is whether a plaintiff plausibly alleges facts that state a violation of the statutes "above a speculative level." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020).

11

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e-2). And the ADEA prohibits employers from discriminating against any individual over the age of 40 "because of such individual's age." *See Gentry v. East West Partners Club Management Co., Inc.*, 816 F.3d 228, 234 (4th Cir. 2016) (quoting 29 U.S.C. § 623(a)(1)). Plaintiff's claims of disparate treatment will survive dismissal if she has alleged "facts to satisfy the elements of a cause of action created by th[ese] statute[s]." *See McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).

Employment discrimination plaintiffs may allege discrimination on a number of grounds, one of which is disparate treatment. Disparate treatment occurs when an "employer simply treats some people less favorably than others because of their [protected class]." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Accordingly, to state a claim of disparate treatment, Plaintiff must plausibly allege that she suffered an adverse employment action because of her gender or age. *McCleary-Evans*, 780 F.3d at 584–85.

Defendants proffer three grounds for dismissal of Plaintiff's disparate treatment claims based on her gender and age. First, Defendants assert that Plaintiff has not alleged that she suffered an adverse employment action. Second, that Plaintiff has not alleged that she suffered disparate treatment from similarly situated employees outside of her protected

12

classes. And, third, that Plaintiff has not alleged that age was the "but for" reason for her adverse employment action. To resolve the core of Plaintiff's dispute, the court will assume without deciding that Plaintiff has adequately alleged that she suffered an adverse employment action.[1]

Turning to Defendants' second ground for dismissal of Plaintiff's disparate treatment claims then, Defendants are correct that Plaintiff has not alleged that she was subject to disparate treatment, at least on account of her gender. The Amended Complaint is devoid of any allegations that similarly situated employees outside of Plaintiff's protected class were subject to disparate treatment by Cannon. Specifically, Plaintiff fails to provide allegations that male senior vice presidents who reported to Cannon did not face the adverse employment actions that she did, such as a PIP, one-on-one sessions with a coach, or Cannon relaying false information to Bell executives. Plaintiff makes only a general allegation that "there were no other women over the age of 40 reporting directly to [Defendant] Cannon." Am. Compl. ¶ 132. From this, the court may reasonably infer that there were in fact other people reporting to Cannon who were men. But the court is still left in the dark about whether those men were at Plaintiff's level in the company, whether they had similar responsibilities to Plaintiff, or whether they were subject to the same conduct in their relationship with Cannon. These gaps mean that Plaintiff's allegation that

---

[1] Plaintiff claims that she suffered adverse employment actions when Cannon placed her on the PIP, required her to meet one on one with Harris, and falsely reported to Bell executives that Plaintiff wanted to resign. Given the court's disposition of Defendants' alternative grounds for dismissal, the court need not decide whether Plaintiff's allegations clear the low hurdle for alleging this element of an employment discrimination claim. *See Muldrow*, 601 U.S. at 354–56.

13

Case 1:24-cv-00882-SDT-JEP    Document 22    Filed 03/21/25    Page 13 of 19

she suffered disparate treatment by Cannon on account of her gender is purely conclusory, warranting dismissal of this claim.

Plaintiff's disparate treatment claim premised on age faces a different flaw. For this claim, Plaintiff does provide comparators, by her reference to the two "younger" women that Cannon hired as senior vice presidents to report directly to him. Am. Compl. ¶ 55. The problem here is that the discriminatory allegations do not give rise to a plausible inference that Plaintiff suffered an adverse employment action because of her age. *See Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 471 (4th Cir. 2025) (recognizing that to plead a disparate treatment theory, a plaintiff must "plead facts supporting a reasonable inference of discriminatory intent").

To plead her ADEA disparate treatment claim, Plaintiff relies on comments that Cannon allegedly made about other women. Am. Compl. ¶ 41 (chief operating officer over 40 was a "joke" and a "disaster" but Bell could not get rid of her because now was "not a good time to trade out horses"); Am. Compl. ¶¶ 43–44 (chief executive officer over 40 was "becoming irrelevant" and Cannon would rather "shoot [himself] in the face" than have to travel with her); Am. Compl. ¶¶ 46–47 (Cannon needed to "educate" in house recruiter over 40). But those comments, even read in a Rule 12(b)(6) posture, "create[] no inference of age bias." *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994). Rather, the comments are derogatory statements made about people who happened to be older than 40. It may be rude to call someone a "joke" or "irrelevant" or to say that they need to be educated. But making those statements about an older person does not thereby mean that the declarant is ageist. *See Bing*, 959 F.3d at 618 ("The mere fact that a certain action is

14

potentially consistent with discrimination does not alone support a reasonable inference that the action was motivated by bias."). Plaintiff's allegations that Cannon mistreated her because of her age are, therefore, conclusory and inadequate to state a claim.

For these reasons, Plaintiff's claims against Cannon alleging disparate treatment based on gender and age are both dismissed.

B.

Next, the court turns to Plaintiff's hostile work environment claim against Bell pursuant to Title VII and the ADEA. In her Amended Complaint, Plaintiff alleges that she "and other women were subjected to persistent verbal harassment by Cannon." Am. Compl. ¶ 190. Specifically, Plaintiff alleges: (1) Cannon stated that Plaintiff had "mental issues" and needed to be fixed; (2) Cannon regularly spoke in a condescending tone through emails and verbal exchanges with Plaintiff; and (3) other women at Bell confided in Plaintiff about Cannon's disrespect for women. Am. Compl. ¶ 190. Plaintiff alleges that senior management at Bell were aware of Cannon's conduct. Further, Plaintiff asserts that Cannon's conduct forced Plaintiff to resign due to the negative impact on her physical and mental health.

To state a hostile work environment claim pursuant to Title VII and the ADEA, a plaintiff must allege: "(1) she experienced unwelcome harassment; (2) the harassment was based on her gender [] or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324

15

Case 1:24-cv-00882-SDT-JEP    Document 22    Filed 03/21/25    Page 15 of 19

F.3d 761, 765 (4th Cir. 2003). Defendants move to dismiss on the ground that Plaintiff has failed to allege that the treatment was "sufficiently severe or pervasive."

Courts consider several factors to evaluate whether alleged working conditions are severe or pervasive enough to support a federal discrimination claim. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 211 (4th Cir. 2022). These factors include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). Activities like simple teasing, offhand comments, and off color jokes, while often regrettable, do not cross the line into actionable misconduct. *Id.* (citing *E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010)).

In *Parker*, the Fourth Circuit held that a plaintiff's allegations of gender-based harassment were sufficiently severe or pervasive to survive Rule 12(b)(6) dismissal. *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 304–05 (4th Cir. 2019). There, a male co-worker started a rumor that the plaintiff slept with her male boss to get a promotion. The rumor was circulated by male employees, including management, and discussed at an all staff meeting without plaintiff present. The plaintiff ended up being blamed for the rumor and ultimately fired.

In explaining its reasoning for holding that the harassment in *Parker* was sufficiently severe and pervasive, the Fourth Circuit characterized the harassment related to the rumor as "all-consuming from the time the rumor was initiated until the time [the plaintiff] was fired." *Parker*, 915 F.3d at 305. The court also highlighted that the harassment was

"threatening" because a manager "slammed" a door in the plaintiff's face, and "screamed" at her when he lost his temper while blaming her for the rumor. *Id.* at 305. Moreover, the harassment was humiliating due to its content. And it interfered with the plaintiff's work as a manager and employee.

On the other side of the ledger, in *Decoster v. Becerra*, 119 F.4th 332, 337–39 (4th Cir. 2024), the Fourth Circuit held that a plaintiff had failed to plausibly allege severe or pervasive conduct. There, the plaintiff alleged that the defendant: (1) humiliated her by both singling her out in front of her colleagues and accusing her of failing in her position; (2) spoke to her with contempt; (3) blamed her for issues that were out of her control; and (4) put her on a performance plan. The court concluded that this level of harassment was more akin to a "difficult working relationship" than the type of attack on the plaintiff's "merit as a human being" that had sufficed in *Parker*. *Id.* at 339 (citing *Parker*, 915 F.3d at 305). While the negative performance assessments that plaintiff cited to were unpleasant, they were not "abusive." *Id.* Moreover, the plaintiff had not alleged "potentially physically abusive behavior." *Id.* Ultimately, the plaintiff's "general characterizations of [the defendant's] tone or manner of speaking while interacting with [the plaintiff] . . . d[id] not provide specific facts that would demonstrate that [the defendant] engaged in the kind of 'discriminatory intimidation, ridicule, and insult' that characterizes a hostile work environment claim." *Id.*

Between these two poles, Plaintiff is squarely in the *Decoster* camp, warranting dismissal. In her own brief, Plaintiff emphasizes that Cannon spoke to her in "a derogatory and condescending manner" and notes "his pervasive disparaging of the abilities of

17

professional women over 40." ECF No. 19 at 12. While these comments are inappropriate in a professional environment, they are more "offensive utterance" than the type of "physically threatening or humiliating" statements that translate into actionable conduct. *See Decoster*, 119 F.4th at 337–8 (speaking to a plaintiff with "contempt" and treating her with "disdain" was insufficient to allege a hostile work environment claim).

For these reasons, Plaintiff's hostile work environment claim against Cannon is dismissed.

C.

Turning to Plaintiff's final federal claim, Plaintiff alleges that she was constructively discharged in violation of Title VII and the ADEA. To plead a constructive discharge claim, a plaintiff must allege that: (1) her working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign; and (2) she actually resigned. *See Green v. Brennan*, 578 U.S. 547, 555 (2016).

As the Fourth Circuit has explained, the "intolerability" standard governing constructive discharge claims is more stringent than the "severe and pervasive" standard for hostile work environment claims. *See Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995). Therefore, the court's disposition of Plaintiff's hostile work environment claims governs its disposition of Plaintiff's constructive discharge claim. Indeed, in *Williams*, the Fourth Circuit held that a plaintiff who claimed that her employer yelled at her, told her she was a poor manager, gave her poor evaluations, chastised her in front of customers, and required her to work with an injured back had still failed to establish the objectively intolerable working conditions necessary to prove a constructive discharge.

*Williams* v. *Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). Plaintiff's own allegations fall short of what was deemed insufficient in *Williams*, thereby warranting dismissal of this claim.

D.

Plaintiff's two remaining claims for tortious interference and negligent supervision and retention both arise under state law. The court declines to exercise supplemental jurisdiction over these pendent claims and dismisses both without prejudice so that Plaintiff may refile in state court if she so wishes. *See* 28 U.S.C. § 1367(c)(3) (authorizing courts to decline to exercise supplemental jurisdiction over state law claims when "the district court has dismissed all claims over which it has original jurisdiction").

IV.

For the foregoing reasons it is therefore ordered that Defendants' Motion to Dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) is GRANTED. Plaintiff's claims against Bell for disparate treatment on account of her gender and age, hostile work environment on account of Plaintiff's gender and age, and constructive discharge are each DISMISSED **with prejudice**. Plaintiff's claim against Cannon for tortious interference and Plaintiff's claim against Bell for negligent supervision and retention are both DISMISSED **without prejudice**.

*SO ORDERED*